UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Abdi Mohamed,

Plaintiff,

v.

Civ. No. 02-225 (JNE/JGL)
ORDER

Sky Chefs, Inc., d/b/a LSG Sky Chefs,

Defendant.

---

Richard T. Wylie, Esq., appeared for Plaintiff Abdi Mohamed.

David J. Duddleston, Esq., and Paul Egtvedt, Esq., Jackson Lewis LLP, appeared for Defendant Sky Chefs, Inc., d/b/a LSG Sky Chefs.

---

Abdi Mohamed brought this action against his former employer, Sky Chefs, Inc., d/b/a LSG Sky Chefs (Sky Chefs), alleging that Sky Chefs discriminated against him because of his race, color, national origin, and religion in violation of federal and state laws. The case is before the Court on Sky Chefs' Motion for Summary Judgment.[1] For the reasons set forth below, the Court grants the motion.

## I. BACKGROUND

Sky Chefs is a caterer that provides food and beverages to airlines for in-flight service. Sky Chefs hired Mohamed, who is black, Somalian, and Muslim, as a supervisor in January 1998. After the terrorist attacks of September 11, 2001, Sky Chefs' business dropped sharply as a result of reduced flights and services such as in-flight meals. That month, Sky Chefs decided to immediately reduce its employee force. Nationwide, it reduced its workforce by 30%. At its

---

[1] Also before the Court is Mohamed's Motion to Strike Portions of Defendant's Record. The Court denies the motion.

AUG 26 2003
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTERED AUG 26 2003
DEPUTY CLERK'S INITIALS

Minneapolis facility, where Mohamed worked, the number of supervisors decreased from 33 to 17. Mohamed was among the supervisors that were furloughed and terminated.

Mohamed alleges that Sky Chefs' decision to furlough and discharge him "had an adverse discriminatory impact on [him] and other employees who are racial minorities, have foreign national origins, have non-white skin color, and are Islamic" in violation of the 42 U.S.C. § 1981 (2000), and the Minnesota Human Rights Act (MHRA), Minn. Stat. ch. 363 (2002). He also alleges that Sky Chefs decided to furlough and discharge him because of his race, color, national origin, and religion, in violation of section 1981 and the MHRA.

## II. DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, Rule 56(e) requires the nonmoving party to respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**A. Section 1981 claims**

Sky Chefs first argues that it is entitled to summary judgment with respect to Mohamed's claims under section 1981 other than for racial discrimination. Section 1981 prohibits purposeful racial discrimination, and does not address discrimination based on national origin or religion. *Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 613 (1987); *see Zar v. S. Dak. Bd. of Exam'rs of Psychologists*, 976 F.2d 459, 467 (8th Cir. 1992). Accordingly, Sky Chefs is entitled to summary judgment insofar as Mohamed asserts claims under section 1981 other than for racial discrimination.

Sky Chefs next argues that it is entitled to summary judgment on Mohamed's section 1981 claim that the reduction-in-force had an adverse impact on racial minorities. Again, section 1981 "can be violated only by purposeful discrimination." *Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391 (1982). Thus, Sky Chefs is entitled to summary judgment on this claim as well. *See id.*

As to Mohamed's claim that he was furloughed and discharged because of his race, the parties agree that the analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), governs.[2] *See Roark v. City of Hazen*, 189 F.3d 758, 761 (8th Cir. 1999). Mohamed must first establish a prima facie case of discrimination. *See id.* The burden then shifts to Sky Chefs to articulate a legitimate, nondiscriminatory reason for furloughing and discharging him. *See id.* If Sky Chefs satisfies its burden of production, Mohamed must show that the proffered reason is pretextual. *See id.*

---

2 The Eighth Circuit recently declined to decide whether *Desert Palace, Inc. v. Costa*, 123 S. Ct. 2148 (2003), alters the burden-shifting analysis of *McDonnell Douglas*. *Allen v. City of Pocahontas*, ___ F.3d ___, 2003 WL 21946908, at *5 n.5 (8th Cir. Aug. 15, 2003). The Eighth Circuit nevertheless applied *McDonnell Douglas*. *Allen*, 2003 WL 21946908, at *5.

To establish a prima facie case of discrimination under section 1981 in the context of a reduction-in-force,[3] Mohamed must show: (1) that he is within a protected racial group; (2) that he met applicable job qualifications; (3) that he was discharged; and (4) some additional evidence that race was a factor in his furlough and termination. *See Herrero v. St. Louis Univ. Hosp.*, 109 F.3d 481, 483-84 (8th Cir. 1997); *Holley v. Sanyo Manufacturing, Inc.*, 771 F.2d 1161, 1165 (8th Cir. 1985). The parties do not dispute that Mohamed satisfies the first three prongs, but they dispute whether he establishes the fourth prong. As support, Mohamed relies of four pieces of evidence: (1) "Somali group" was written on his resume when he was interviewed in December 1997; (2) statistics describing the racial composition of the supervisors before and after the reduction-in-force; (3) Sky Chefs allegedly gave different reasons for furloughing and discharging him; and (4) Sky Chefs' hiring decisions in 2002. The Court will consider this evidence in turn.

As to the note on Mohamed's resume, it is the practice of Sky Chefs to ask where a candidate heard about a job opening and to note the candidate's response. Mohamed learned of the position with Sky Chefs through an organization called "Somali Community of Minnesota." The notation on his resume was made during an interview in December 1997. A fair inference is that the interviewer asked Mohamed where he had heard about Sky Chefs and noted Mohamed's response. Even if there is another explanation for the notation, the notation fails to establish the fourth prong. The notation was made in connection with Mohamed's hiring, almost four years

---

[3] Mohamed argues that a reduction-in-force is not present in this case because Sky Chefs filled the positions that would remain from an applicant pool consisting of the existing supervisors. At its Minneapolis facility, Sky Chefs reduced the number of supervisors from 33 to 17, redistributed supervisory responsibilities, and selected supervisors to retain based on past performance, skills, and potential. Under these circumstances, Sky Chefs undertook a reduction-in-force. *See Holley v. Sanyo Mfg., Inc.*, 771 F.2d 1161, 1163, 1165 (8th Cir. 1985).

before his termination, and there is no evidence in the record that it was considered in connection with his furlough and termination. Consequently, the notation does not satisfy the fourth prong. *See Saulsberry v. St. Mary's Univ. of Minn.*, 318 F.3d 862, 867-86 (8th Cir. 2003) (stating no reasonable jury could infer discriminatory intent based on stray comments regarding race that were unrelated to decisional process).

The same conclusion is warranted with respect to the statistics presented by Mohamed regarding the racial composition of the supervisors in Minneapolis before and after the reduction-in-force. The statistics presented by Mohamed are based on incorrect data, rendering them unreliable. Putting aside those concerns, Mohamed is not qualified to offer opinions regarding statistical evidence. *See* Fed. R. Evid. 701. The only expert testimony in this case regarding statistical evidence comes from Brian McCall, Associate Professor of Human Resources and Industrial Relations and Director of the Human Resources Institute at the Carlson School of Management, University of Minnesota. McCall concludes that there is no statistically significant evidence that the reduction-in-force had an adverse impact based on race. For these reasons, Mohamed's reliance on statistical evidence to establish his prima facie case is unavailing.

Mohamed next argues he satisfies the fourth prong of his prima facie case because Sky Chefs allegedly offered inconsistent explanations as to how it decided which supervisors to furlough and terminate, particularly Mohamed. His use of these alleged inconsistencies conflates the fourth prong of his prima facie case with the second and third steps of the *McDonnell Douglas* analysis—that is, he seeks to establish the fourth prong by demonstrating that the legitimate, nondiscriminatory reasons offered by Sky Chefs are pretextual. *See Alford v. Cosmyl, Inc.*, 209 F. Supp. 2d 1361, 1368 (M.D. Ga. 2002) (stating that employer's inconsistent reasons

for firing employee are evidence of pretext). In doing so, Mohamed ignores the Eighth Circuit's admonition against collapsing the three-step inquiry of *McDonnell Douglas* into a single inquiry. *Turner v. Honeywell Fed. Mfg. & Techs., LLC*, 336 F.3d 716, 722 (8th Cir. 2003); *Hawkins v. Anheuser-Busch, Inc.*, 697 F.2d 810, 813-14 (8th Cir. 1983). Accordingly, Mohamed's reliance on the alleged inconsistencies to establish his prima facie case is misplaced.

The final piece of evidence Mohamed relies on to satisfy the fourth prong is that Sky Chefs hired six supervisors at the Minneapolis facility in 2002—five Caucasians and one Hispanic. One of the six was actually hired in May 1993; he was transferred to Minneapolis in May 2002. Of the remaining five, the hiring dates range from April to September 2002. Mohamed does not explain how decisions six to twelve months after the reduction-in-force relate to his claim. He did not reapply for a supervisor position in 2002, and he does not dispute that legitimate business reasons led Sky Chefs to reduce its workforce in September 2001. Under these circumstances, Sky Chefs' hiring decisions in 2002 do not satisfy the fourth prong.

Even if Mohamed had established a prima facie case, Sky Chefs would be entitled to summary judgment because Mohamed failed to demonstrate that the reasons articulated by Sky Chefs for his furlough and termination are pretextual. Sky Chefs articulates the following legitimate, nondiscriminatory reasons for Mohamed's furlough and discharge. On September 21, 2001, the Minneapolis facility received guidelines on how to implement the reduction-in-force. The guidelines called for the development of an "'ideal' organization structure which would include only those positions/functions needed to run an efficient but effective organization, " and the selection of employees to fill the remaining positions based on past performance, skills, and potential. Shortly after receiving the guidelines, senior management at the Minneapolis facility—Karen Harrison, Ian Davis, William Keown, Michael Dowd, and Tonino Palladinelli—

met to implement them. Senior management evaluated the supervisors in the three categories on a five-point scale, discussed the supervisors, and revised evaluations accordingly. Ultimately, senior management decided which supervisors to retain. Employees who received ratings of 2.0 or less were furloughed and terminated. Employees rated greater than 3.3 were retained. Some employees rated greater than 2.0 and less than or equal to 3.3 were retained; others were furloughed and discharged.

Mohamed worked in three departments during his tenure at Sky Chefs: Liquor Room, Customer Service Final Stage, and Customer Service Key Accounts. He was working in Key Accounts on September 11, 2001. Sky Chefs retained Erik Shirley, the supervisor with the broadest skill base in the Key Accounts department.[4] Sky Chefs also considered Mohamed for supervisor positions in departments where he had previously worked. His overall rating of 2.7—4 in performance, 3 in skills, and 1 in potential—compelled neither his retention nor his furlough. Based primarily on his low rating for potential, Sky Chefs decided to furlough and terminate him.

Relying on the deposition testimony of Harrison, Mohamed asserts that an issue of fact exists as to whether senior management discussed him. According to Mohamed, Harrison testified that "no one at the [senior management] meeting said anything about [him]." The Court's review of Harrison's deposition reveals that Mohamed mischaracterizes her testimony. Harrison repeatedly testified that she did not remember whether anyone at the meeting spoke about Mohamed.

The other four senior management members recalled discussions about Mohamed, specifically his potential in terms of communication skills. Keown testified:

---

4 Shirley's overall rating exceeded that of Mohamed.

> We discussed his potential, his ability to function within the new organization and new leaner organization that we would have. He was rated low in that area because of communication skills because of his demonstrated inability to interact well with his peer group especially folks from other departments outside of his own department and lack of initiative.

Palladinelli recalled discussions about Mohamed's "interpersonal skills, [his] communications skills, lack of." Dowd recalled discussions between Keown and Palladinelli about Mohamed's communications skills:

> I don't remember anything specifically [that was said about Mohamed] except that I can tell you that the two people in the room who were most directly involved in . . . Mohamed's day-to-day activities which is . . . Keown and . . . Palladinelli did engage in some discussions about his communication skills and his willingness to change or lack of willingness to change or hesitation perhaps but I do recall some discussion about that.

Similarly, Davis recalled a discussion about Mohamed's relatively poor communication skills: "I recall a dialog[ue], and I believe it was principally a dialog[ue] between . . . Keown, our director of operations, and [Palladinelli] where they both felt that [Mohamed] was poor relative to his peers in ensuring critical operational information day-to-day was shared with peers." Thus, four of the five people present at the meeting recall discussions about Mohamed's communication skills; one does not remember whether such discussions took place. Under these circumstances, no issue of fact exists as to whether Keown and Palladinelli discussed Mohamed's communications skills.

Mohamed asserts that Sky Chefs' explanations for his furlough and termination are pretextual because Sky Chefs offered inconsistent explanations. *See Alford*, 209 F. Supp. 2d at 1368. The Court disagrees. Again, Sky Chefs retained the supervisor with the broadest skill base in the Key Accounts department. Mohamed's relatively low rating for potential led Sky Chefs not to place him in departments where he had previously worked. Mohamed's assertion that Sky Chefs' explanations for his furlough and discharge are pretextual is not persuasive.

In short, Mohamed failed to establish a prima facie case that Sky Chefs discriminated against him on the basis of his race when it furloughed and discharged him as part of its reduction-in-force shortly after September 11, 2001. Even if he had, he did not rebut Sky Chefs' legitimate, nondiscriminatory reasons for furloughing and discharging him. Accordingly, Sky Chefs is entitled to summary judgment on this claim.

**B. MHRA claims**

Under the MHRA, it is an unfair employment practice to discharge an employee because of the employee's race, color, religion, or national origin. Minn. Stat. § 363.03, subd. 1(2). The analysis set forth in *McDonnell Douglas* applies to MHRA claims. *Dietrich v. Canadian Pacific, Ltd.*, 536 N.W.2d 319, 323 (Minn. 1995). To establish a prima facie case in the context of a reduction-in-force, a plaintiff must satisfy the requirements of *Holley*. *Dietrich*, 536 N.W.2d at 324-25. Again, Mohamed must show: (1) that he is within a protected group; (2) that he met applicable job qualifications; (3) that he was discharged; and (4) some additional evidence that his protected characteristics were factors in his furlough and termination. *See id.*

To establish his prima facie case, Mohamed relies on essentially the same evidence discussed in connection with his section 1981 claims. As already discussed, he fails to establish a prima facie case of discrimination based on race. The same conclusion is warranted with respect to his other claims. Even if he had established a prima facie case, Mohamed failed to demonstrate that the legitimate, nondiscriminatory reasons offered by Sky Chefs for his furlough and discharge are pretextual. Accordingly, Sky Chefs is entitled to summary judgment on these claims.

As to Mohamed's adverse impact claim under the MHRA, Minnesota law places the burden on him of "showing that an employment practice is responsible for a statistically

significant adverse impact on a particular class of persons protected by" section 363.03, subd. 1(2). Minn. Stat. § 363.03, subd. 11. There is no evidence in the record that the reduction-in-force had a statistically significant adverse impact based on race, national origin, religion, or color. Sky Chefs is therefore entitled to summary judgment on this claim.

## III. CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Mohamed's Motion to Strike Portions of Defendant's Record [Docket No. 21] is DENIED.

2. Sky Chefs' Motion for Summary Judgment [Docket No. 16] is GRANTED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: August 26, 2003

JOAN N. ERICKSEN
United States District Judge

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

DATE MAILED TO COUNSEL/PRO SE PARTIES:

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make Additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

C:\FORMS\APPEAL NO. CIV
Rev. August 11, 1995

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information <u>must</u> be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*